IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 10, 2004 Session

## JIM PRATT, ET AL. v. J.W. GIBSON d/b/a J.W. GIBSON CO.

Appeal from the Circuit Court for Roane County
No. 12146     Russell E. Simmons, Jr., Judge
FILED JUNE 22, 2004

No. E2003-00114-COA-R3-CV

This appeal involves competing claims for breach of contract.  J.W. Gibson d/b/a J.W. Gibson Company ("Defendant"), entered into an oral contract with Pratt Masonry Company ("Pratt Masonry") for Pratt Masonry to furnish masonry work on a house.  When the work was completed, Defendant refused to pay, claiming the masonry work was so defective that all the bricks had to be removed and replaced.  Pratt Masonry filed suit seeking payment for the work performed under the oral contract.  Defendant counterclaimed for damages incurred in having to remove and replace the bricks.  The Trial Court concluded Pratt Masonry breached the contract by performing substandard masonry work, but Defendant failed to prove it was necessary to remove and replace all the bricks. Both parties appeal.  We modify the judgment of the Trial Court and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment
of the Circuit Court Modified; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS. P.J., E.S., and CHARLES D. SUSANO, JR., J., joined.

Keith McCord, Knoxville, Tennessee, for the Appellant J.W. Gibson d/b/a J.W. Gibson Company.

Terrill L. Adkins, Knoxville, Tennessee, for the Appellees Jim Pratt and Ron Pratt d/b/a Pratt Masonry Company.

**OPINION**

Background

Defendant entered into oral contracts with Jim and Ron Pratt d/b/a Pratt Masonry Company ("Plaintiffs") for Plaintiffs to furnish brick masonry work on two single family residential houses Defendant was building on two lots in Roane County.  Defendant agreed to pay $12,296 for the masonry work on lot 13, and $500 for the masonry work on lot 2.  In the complaint, Plaintiffs claim that Defendant refused to pay Plaintiffs anything after they completed the masonry work. Plaintiffs sued for breach of contract seeking monetary damages of $12,796.

Defendant filed an answer and generally denied any liability to Plaintiffs. Defendant claimed the work performed by Plaintiffs was so defective that he had to remove and replace all of the bricks and repair the house on lot 13. Defendant admitted receiving invoices from Plaintiffs, but denied owing Plaintiffs any money because Plaintiffs had breached the oral contract by performing defective work. Defendant also filed a counterclaim, asserting that the work performed by Plaintiffs on the Lot 13 house was contrary to good workmanship practices, industry standards, and relevant codes applicable to such work. According to Defendant, the cost to remove and replace the defective masonry work on that house exceeded $30,000. Defendant sought damages of not less than $30,000, plus prejudgment interest and costs.

Jim Pratt ("Pratt") testified he is a brick mason contractor. Pratt has been a brick mason for twenty-two years and is currently in business with his brother, Ray Pratt[1], and together they have operated Pratt Masonry for seven or eight years. Pratt hires crews to lay the bricks, and he supervises the workmanship of these employees. With regard to the work on lot 13, Defendant supplied the bricks, mortar, and wall ties, etc. Pratt testified he is familiar with the standards and practices recognized by brick masons in the East Tennessee area and the work performed for Defendant was done in accordance with these standards.

The project on lot 13 was completed on June 22, 2000, at which time Plaintiffs sent Defendant a bill for the contract price of $12,296.[2] Pratt first learned that Defendant was not satisfied with the work approximately two or three weeks after the project was completed. Pratt testified that Defendant's complaints involved "[n]othing that we did." Pratt claimed he was not given any notice by Defendant that the brick work was going to be torn down until he received a letter from Defendant's attorney, and by that time the bricks already had been removed.

After Pratt learned Defendant was not satisfied with the masonry work, Pratt met with Defendant to discuss the situation, at which time Defendant told him it was the "sorriest" brick job he had ever seen in forty years of working construction. At trial Pratt claimed the reason the brick looked so bad was because it had been pressure washed, which was something Defendant undertook after Plaintiffs completed the job. Pratt stated that the type of brick used on lot 13 had a label which specifically recommended against pressure washing. Pratt testified that even though the problems were not caused by Pratt Masonry employees, he nevertheless offered to correct some of the problems. However, Defendant informed him that the brick work could not be fixed to meet Defendant's standards. One of the aspects of the work that Defendant had problems with was the lack of weep holes. According to Pratt, Defendant never asked him to put in weep holes. When Pratt and Defendant were discussing the alleged problems, Pratt offered to go over the house in detail

---

[1] The complaint was filed by Jim and Ron Pratt d/b/a Pratt Masonry Company. It appears that Ron Pratt and Ray Pratt are one and the same. We will refer to Ron/Ray Pratt as "Ray Pratt".

[2] Defendant stipulated at trial that the work performed on the $500 oral contract for lot 2 was satisfactory. However, the $500 was not paid because Defendant claimed it as an off-set toward the repair costs on lot 13. In light of this stipulation, we will limit our discussion of the facts as they pertain to lot 13.

but refused to tear down the brick and start over, even though Defendant continued to insist that all the brick be replaced.

Pratt admitted there are codes regulating masonry work, including the installation of wall ties. Because lot 13 was within the city limits of Oak Ridge, Pratt admitted he was required to comply with the Oak Ridge City Code. Pratt claimed he checked on whether or not his work crew was putting in a sufficient number of wall ties to comply with the requirements of the Oak Ridge City Code.

David Hudson ("Hudson") testified at trial. Hudson was hired by Defendant to oversee the construction. Hudson acknowledged that while Pratt Masonry was working on lot 13, Defendant was in the hospital after having been diagnosed with cancer. According to Hudson, it was approximately one month after the project was completed before Defendant had the brick pressure washed using acid. After this cleaning was done, the acid bleached the mortar and it was a lot whiter looking. Hudson recommended Pratt Masonry to Defendant. Defendant asked Hudson to resign because of the "messy job" performed by Plaintiffs.

The next witness was Edward Jeffries ("Jeffries"), a principal with Chattanooga Brick and Tile as well as the manager of Knoxville Brick Company. Jeffries is a brick distributor for thirty-two companies and has been in the brick industry for twenty-four years. Sixty percent of Jeffries' business involves building houses, which amounts to several hundred houses being constructed each year. Jeffries furnished the brick to be used on lot 13. Jeffries later received a call from Defendant telling him there were problems with the bricks. Jeffries personally visited the construction site to inspect the brick. He found head joints around the front door that were as much as an inch in diameter when they should have been no more than 3/8 of an inch. According to Jeffries, the masonry work on lot 13 was unacceptable. Jeffries testified that in all of his years of examining masonry work on residential houses, he has seen only a couple of masonry jobs that looked worse than the original masonry work on lot 13. Jeffries testified that Sure-Clean 600 acid would be an acceptable type of acid to use on the brick which was used on lot 13.

The next witness was Ted Fox ("Fox"), who works for the City of Oak Ridge as an assistant code enforcement administrator and building inspector. On July 21, 2002, Fox initially inspected the house being built on lot 13. A second inspection took place as the brick was being removed. Fox found during these inspections that the brick walls were missing wall ties and weep holes, both of which constituted a violation of the Oak Ridge City Code or the Southern Building Code. Fox testified the initial masonry work was not performed in accordance with the codes and standards of the City of Oak Ridge. Fox's inspection revealed an eight foot by ten foot section of brick that had no wall ties at all, and other areas where wall ties were "[v]ery, very sporadic."

Defendant testified that he has been a general contractor for over forty-five years. Defendant built several houses in the subdivision where lot 13 is located. The house on lot 13 is the only house that has not been sold, with the exception of one other house where the occupant has entered into a lease to purchase agreement. Defendant recalled only two other times that he has had

to tear down masonry work and have bricks replaced, one time in the 1960's and the other in the 1970's.

Defendant contracted with Plaintiffs because Hudson recommended them. While Defendant was in the hospital, Hudson was supposed to check on the house. Hudson later informed Defendant that he had been too busy to do this. Defendant inspected the house on lot 13 once he was released from the hospital. According to Defendant:

> I noticed the big old joints. And in some places … where half a brick should have went they had mortar, and it had holes in it and it was really sloppy. And around the front door [there were] big old joints. I mean, like an inch or better, and it was sloppy and smeared. And all around the house there was mortar that wasn't between the brick, and it was just a horrible job. So that's when I contacted one of the Pratts, and we met up there and I showed it to him. And I mentioned tearing it down and he said that they couldn't afford to tear it down.

Defendant testified that the bricks had not been pressure washed when he initially met with Pratt to discuss the quality of the masonry work. According to Defendant, Pratt agreed there were problems and admitted he would not want brick work like that on his house. Pratt told Defendant the bricks would look better if Defendant cleaned them. Defendant disagreed but eventually pressure washed the bricks and used acid hoping this would make the bricks look better. This did not work. On the other hand, the pressure washing did not make the bricks look any worse either. Defendant claimed the problems with the brick work were throughout the entire job and were so significant that the bricks had to be torn down and replaced. Defendant stated the bricks were starting to buckle at the top of the second floor due to a lack of wall ties. In fact, one of Defendant's carpenters told him it looked like the wall was getting ready to fall. Defendant learned of the lack of wall ties only after he started having the bricks removed.

Defendant testified that the masonry work performed by Plaintiffs on lot 13 did not meet the standards of construction, quality of workmanship, or the standard of care acceptable in the construction industry. Defendant claimed there was no way for him to correct all of the problems without having the bricks removed and replaced, which cost him a total of $30,508.33.

Ray Pratt also was called as a witness. Ray Pratt testified he took pictures of the house after it had been re-bricked and it looked even worse. Ray Pratt acknowledged that he and his brother told Defendant they would redo "everything that was reasonable. Tearing the brick off the house, redoing it, that's very unreasonable." According to Ray Pratt, the brick did not need to be removed. Ray Pratt testified that he personally installed the wall ties, they were installed in a proper number and manner, and the inspector from the City of Oak Ridge simply was wrong. Ray Pratt admitted it was his responsibility to make sure there were a sufficient number of wall ties. Ray Pratt

testified the masonry work performed on lot 13 was not defective in any way and conformed in every aspect to the Southern Standard Building Code.

Both parties called other witnesses who supported their respective positions regarding the quality of the brick work on lot 13, as well as whether it was necessary to remove and replace all of the brick. When the evidence was completed, the Trial Court issued its ruling from the bench. With regard to the $500 project on lot 2, the Trial Court awarded Plaintiffs a judgment for $500, but concluded pre-judgment interest was not appropriate. Concerning lot 13, the Trial Court stated:

> As to the testimony of each witness presented, except for Ted Fox with the Oak Ridge code enforcement, the Court finds that the attorneys have very skillfully pointed out each witness's bias and prejudice and has raised an issue of credibility with each witness.… The Court does not find that the parties were untruthful as to factual issues, but that their bias and their manner in which they answered questions raised significant questions of credibility …. Business relationships and friendships were evident between the parties and some of the other witnesses.

The Trial Court then reviewed the conflicting evidence presented at trial regarding the quality of the masonry work performed on lot 13, including photographs which the Trial Court described as showing "a lack of workman-like quality." The Trial Court also reviewed Fox's testimony, describing his as a "disinterested witness whose testimony was that the work violated two code sections; one concerning weep holes, and the other one concerning brick ties." The Trial Court concluded it was the responsibility of Plaintiffs to do the masonry work in compliance with the relevant code sections. Even though Pratt claimed Defendant did not specifically state he wanted weep holes, the Trial Court held that Defendant would have provided the necessary materials if Plaintiffs had simply requested them. The Trial Court then discussed the claimed lack of wall ties, stating:

> As to the tie downs, the most compelling evidence is the testimony of Ted Fox. That he viewed the walls after the brick[s] were taken away and there was not sufficient ties to comply with the code requirements, and that he observed an eight foot by ten foot section of bricks which had no ties. The Court finds that although there were some ties used, there was not a compliance with the code requirement which constitutes a negligent workmanship or work not within the standard of the trade.

Based on the foregoing, the Trial Court concluded that the preponderance of the evidence was such that Plaintiffs breached their contract to perform the services in a "workman-like manner."

The Trial Court then discussed Defendant's counterclaim and his request for over $30,000 in damages resulting from having to remove and replace the bricks. According to the Trial Court, there was no expert proof that the walls were unstable or that they were going to fall. Although there was testimony that insufficient ties could lead to a structural problem, there was no direct proof that the work "in this particular instance was going to fall or would become a structural problem." In short, the Trial Court concluded Defendant had failed to prove it was necessary to remove and replace all of the bricks and awarded Defendant nominal damages of $500, with no prejudgment interest.

Plaintiffs appeal, arguing the Trial Court erred when it concluded the masonry work was defective and Plaintiffs were in breach of contract. Plaintiffs also claim that since Defendant waited two weeks before complaining about the allegedly defective work, Defendant waived the right to object to the quality of the work. Defendant also appeals, claiming the Trial Court erred when it concluded that he had not proven it was necessary to remove all of the brick and further erred in awarding only nominal damages of $500 without prejudgment interest.[3]

## **Discussion**

The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. Of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The Trial Court certainly was presented with a wide array of testimony regarding the workmanlike quality of the masonry work performed by Plaintiffs on lot 13. In assessing this conflicting testimony, the Trial Court had the opportunity to assess the credibility of the various witnesses, as well as any biases each particular witness may have had. "Unlike this Court, the trial court observed the manner and demeanor of the witnesses and was in the best position to evaluate their credibility." *Union Planters Nat'l Bank v. Island Mgmt. Auth., Inc.*, 43 S.W.3d 498, 502 (Tenn. Ct. App. 2000). A trial court's determinations regarding credibility are accorded deference by this Court. *Id.; Davis v. Liberty Mutual Ins. Co.*, 38 S.W.3d 560, 563 (Tenn. 2001). In the present case, the credibility of the witnesses obviously impacted the Trial Court's conclusions. The Trial Court was most impressed with the testimony of Fox who unequivocally testified that the masonry work was not in compliance with applicable codes in at least two regards, these being the lack of weep holes and the lack of wall ties. We do not believe the evidence preponderates against the Trial Court's findings that the masonry work was not performed in a "workman-like" manner and that it was in violation of applicable codes. We, therefore, affirm the Trial Court's conclusion that Plaintiffs breached the oral contract with Defendant.

---

[3] Both Plaintiffs and Defendant filed notices of appeal and surety bonds. Because Defendant's notice of appeal was filed with the Trial Court first, we designate Defendant as the appellant for purposes of this appeal.

The next issue involves Defendant's claim that the Trial Court erred when it concluded Defendant failed to prove by a preponderance of the evidence that it was necessary to remove and replace all of the masonry work. In reaching this conclusion, the Trial Court noted that while proof had been introduced that the lack of wall ties *could* cause structural problems, Defendant offered no direct proof that the brick walls on lot 13 were going to fall or that structural problems actually existed.

Based on the facts of this case, we do not believe Defendant was required to prove that a collapse of the walls was imminent. Even if the walls were structurally sound for the moment, the house nevertheless was not in compliance with the requirements of the Oak Ridge City Code and/or the Southern Standard Building Code because of the lack of wall ties and weep holes. Relying on the testimony of Fox, the only witness whose testimony favorably impressed the Trial Court, it is clear that the wall ties were "very, very sporadic" even in those areas that had the ties. The proof also established that a lack of wall ties can lead to structural problems. We do not believe Defendant was required to adopt a "wait and see" attitude and keep his fingers crossed hoping that the walls would not collapse. The potential liability should the walls collapse could be immense. We conclude that the evidence preponderates against the Trial Court's conclusion that Defendant did not prove that the bricks had to be removed and replaced in order to correct the code violations.

Having reached the above conclusion, we reject Plaintiffs' argument that Defendant waived the right to object to the quality of work because he waited two weeks before voicing any complaints. We reject this argument for two reasons. First, Defendant was in the hospital when the work was completed. Second, Plaintiffs have consistently maintained that the bricks did not have to be replaced and have steadfastly refused to do so. Even if Defendant had immediately complained about the masonry work, it would have been to no avail given Plaintiffs' position on this matter. Clearly Plaintiffs' position changed in no way because of this two week delay.

The purpose of assessing damages in a breach of contract case is to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. *Adams TV of Memphis, Inc. v. Comcorp of Tennessee, Inc.*, 969 S.W.2d 917, 922 (Tenn. Ct. App. 1998); *Action Ads, Inc. v. William B. Tanner Company, Inc.*, 592 S.W.2d 572, 575 (Tenn. Ct. App. 1979). The injured party, however, is not to be put in a better position than he would have been in by recovery of damages for breach of the contract. *Adams TV*, 969 S.W.2d at 922.

If Plaintiffs had not breached the contract by performing defective work on the lot 13 house, Defendant would have paid $8,634.02 for the bricks and then paid Plaintiffs $12,296 for the masonry work. However, the contract was breached and the breach was such that Defendant was required to remove and replace the existing brick. In so doing, Defendant incurred damages in the amount of $8,638.15 for the replacement cost of the new bricks. The total cost of labor, etc., resulting from having to re-brick the house on lot 13 totaled $14,236.16. Therefore, it cost Defendant $1,940.16 more to have the house re-bricked than he would have spent had Plaintiffs not breached the contract ($14,236.16 - $12,296 = $1,940.16), keeping in mind that Plaintiffs never were paid for the initial work. Defendant's damages associated with lot 13 include the cost of the

replacement brick (i.e., $8,638.15), plus the additional labor costs (i.e., $1,940.16), for total damages of $10,578.31. Because Defendant owes Plaintiffs $500 for the work performed on lot 2, we will off-set the $500 judgment previously awarded to Plaintiffs, thereby entitling Defendant to a judgment for $10,078.31. An award of this amount will place Defendant, as nearly as possible, in the position Defendant would have been in had Plaintiffs not breached the contract.

Finally, we address Defendant's claim that the Trial Court erred when it failed to award prejudgment interest. An award of prejudgment interest is within the sound discretion of the trial court and will not be disturbed on appeal unless the record reveals a "manifest and palpable" abuse of discretion. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). A trial court has "considerable deference in the prejudgment interest decision." *Id*. Several recent decisions by our Supreme Court and this Court have shifted the balance in favor of awarding prejudgment interest whenever doing so will more fully compensate the plaintiff for loss of use of his or her funds. *See, e.g., Myint, supra; Utter v. Sherrod*, 132 S.W.3d 344 (Tenn. Ct. App. 2003). In the present case, when the Trial Court concluded neither party was entitled to prejudgment interest, it did so only after awarding off-setting judgments in the amount of $500. If the parties had been awarded prejudgment interest, these awards likewise would have off-set. We have modified the Trial Court's judgment and awarded Defendant $10,078.31. The Trial Court never considered whether prejudgment interest was appropriate to this award of $10,078.31. In *Myint*, the Court discussed at length the various principles to be considered when awarding prejudgment interest. After reviewing these principles, we conclude Defendant is equitably entitled to prejudgment interest on the $10,078.31 and cannot be fully compensated without such an award.

## Conclusion

The judgment of the Trial Court is modified and Defendant is awarded a judgment in the amount of $10,078.31, plus prejudgment interest. This cause is remanded to the Trial Court for calculation of the prejudgment interest and entry of a judgment for the total of the $10,078.31 plus the prejudgment interest as calculated by the Trial Court, and for collection of the costs below. Costs on appeal are assessed against the Appellees, Jim Pratt and Ron Pratt d/b/a Pratt Masonry Company, and their surety.

_____
D. MICHAEL SWINEY, JUDGE